UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
ELIE GRANGER,

                Petitioner,

**MEMORANDUM & ORDER**

       -against-

17 CV 888 (RJD)

DALE ARTUS,

              Respondent.

------------------------------------------------------x
DEARIE, District Judge.

Before the Court is the application of petitioner Elie Granger for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

After a jury trial in Queens Supreme Court at which he represented himself, petitioner was convicted of assault in the first degree, N.Y. Penal Law § 120.10[1], and endangering the welfare of a child, N.Y. Penal Law § 260.10[1], and sentenced as a second violent felony offender to concurrent terms of twenty-five years and one year plus five years' post-release supervision.  The jury acquitted petitioner of the more serious charge of attempted murder in the second degree.

The charges and conviction are the result of petitioner's stabbing of Eduarda Oliva ("Eduarda").  The trial evidence established that at approximately 9:50 a.m. on June 22, 2008, as Eduarda and her then thirteen-year-old daughter Kayla were walking on a sidewalk on Queens Plaza North in Long Island City, petitioner rode up to them on a bicycle, stopped in front of them, and while straddling his bicycle and staring into Eduarda's eyes, stabbed her in the chest, causing a hole in the left ventricle of her heart and in her pericardium that would have resulted in her death had she not received emergency medical treatment.

In a set of sprawling submissions, petitioner advances the following grounds for habeas relief: violation of his rights under Brady v. Maryland, 373 U.S. 83 (1963); untimely disclosure of Rosario materials; insufficiency of the evidence of identification, serious physical injury, and endangerment; ineffective assistance of pre-trial and standby trial counsel; ineffective assistance of appellate counsel; judicial bias; improper admission of prior bad acts evidence under People v. Molineux, 168 N.Y. 264 (1901); and improper adjudication as a second violent predicate felon.

As will be discussed, none of the claims warrants the extraordinary remedy of habeas relief.  Accordingly, the application for a writ of habeas corpus is denied and the petition is dismissed.

## FACTUAL BACKGROUND

### A.   The Trial

The focus of the trial was identification.  The state's evidence included: Eduarda's in-court identification; Kayla's line-up and in-court identification; surveillance video from three businesses in the crime scene vicinity (the "scene videos") that corroborate key segments of the victims' narratives (but do not capture the crime itself or the face of the bicyclist-assailant); surveillance video from the Greenpoint Hotel, where petitioner lived ("the Greenpoint video"), that shows petitioner leaving his home three hours before the crime in the same clothing worn by the bicyclist-assailant in the scene videos—a distinctive black and white horizontally-striped polo shirt and blue jeans; an ATM receipt and surveillance video that placed petitioner at a delicatessen approximately 6/10 of a mile from the crime approximately 11 minutes after its commission; petitioner's statement that someone who "had it in for him" arranged for another individual to purchase petitioner's bicycle and clothing; and prior crimes' evidence admitted pursuant to People v. Molineux, 168 N.Y. 264 (1901), demonstrating that on two prior occasions,

2

petitioner rode up to individuals and stabbed them in the chest in the same distinctive manner in which Eduarda was attacked.[1]

Eduarda.  Eduarda testified that shortly before 10 a.m. on Sunday, June 22, 2008, she was walking with her daughter on the sidewalk on Queens Plaza North, approximately two blocks from the Scandals night club where her husband worked as a security guard, when she noticed a bicyclist coming from behind them on the sidewalk, nearer to Kayla.  Eduarda pulled Kayla toward her to create space for the bicyclist to pass.  Approximately five or six feet in front of them, the bicyclist made a U-turn, came "right towards" them and stopped, placing his feet on the ground and straddling his bike.  He was approximately seven or eight inches, or an arm's length, in front of Eduarda's face.  812, 830.[2]  Then, with  "something . . . in [his] hand," he punched Eduarda in the left side of her chest.  812-13.

After the stabbing, the bicyclist "just stood there and looked directly into" Eduarda's eyes, with "like a devilish look" for "a few seconds" while Eduarda "was looking right at him. . . trying to process…everything that was happening."  814-15.  It was a sunny day and nothing was blocking her view .

---

[1] Petitioner challenged the admissibility of much of this evidence at a four-day pre-trial hearing where he was represented by counsel.  Rejecting his claim that his arrest in the doorway of his SRO hotel room violated Payton v. New York, 444 U.S. 573 (1980), the hearing court held that the ATM receipt was recovered as part of a constitutionally proper administrative procedure after petitioner's arrest, that his statement was voluntary, and that the lineup was not suggestive. Decision & Order dated March 16, 2010, at 6-7.

[2] All page references are to the trial transcript unless otherwise indicated.

As Eduarda began to bleed, she felt dizzy, told Kayla to go for help, and soon fell to the ground.  From there, she saw the assailant pedaling away under the bridge.  833. She recalled that she was soon in an ambulance, in pain, and struggling to breathe.  816.

Eduarda identified petitioner at trial as her assailant on the basis of "the face and then his eyes."  857, 816.  She confirmed that he did not take anything from her and did not speak to her or to Kayla.

On cross-examination, petitioner elicited that when interviewed in her hospital approximately five days after the stabbing, Eduarda did not remember what her assailant was wearing, but was sure that he was a bald, light-skinned black man, 830, 835,[3] and that she "just remember[ed] the eyes, the evil eyes that looked at [her] while [she] was dying." 829, 830. Asked what was special or distinctive about his eyes, Eduarda testified that they were brown[4] and wide-opened, that she "could not forget them," and that "[j]ust looking at [petitioner] right now, that's pretty much it."  831.  She further testified: "you had just stabbed me right through my heart and you are looking into my eyes with that same face you have right now.  This is what I remember."  848.

Kayla.  Kayla's narrative of the relevant events is materially the same as Eduarda's.  755-59.  She testified that, "[w]hen we were walking down the street, the sidewalk, someone came up

---

[3] Between the time of the crime and trial Granger had grown a beard.  836

[4] In his defense case, petitioner called a detective who participated in his arrest and asked if he could tell from the witness stand whether petitioner's eyes were dark blue or brown; the detective stated that they were not dark blue.  1113.  At the close of the defense case, petitioner published his eyes to the jury for approximately 20 seconds, 1155, 1170, and argued in summation that they were dark blue.

4

to my mother and hit her in the chest." 756.  She had an opportunity to view the person on the

bicycle when, after pedaling up to them, he stopped in front of them.  757.  The bicyclist looked

"a bit taller than [her] father, maybe six feet, black, light-skinned" with a wrinkle on his

forehead.  758.  She saw the man's hand in a fist and heard "the thud" when he struck her

mother.  759.  After the attack, the bicyclist rode off under the bridge, and Kayla ran back up the

block toward the Scandals club and found someone with a cellphone who dialed 911.

Kayla also identified petitioner as the assailant at a line-up on June 24, 2008, two days

after the crime.  Petitioner's cross-examination of Kayla thoroughly explored the line-up,

including the fact that she was shown one of the crime-vicinity surveillance videos at the police

precinct shortly beforehand.  781, 797.[5]  Petitioner also fully explored Kayla's capacity to

observe him at the time of the crime, 766-777, eliciting that she was "sure" he was the man who

attacked her mother."  794.  Asked what "makes [her] sure, Kayla testified, "During the lineup I

envisioned every person on a bike and when I saw you, you were the person that I saw on the

bike from when my mom was attacked."  794.

Kayla had given the police varying descriptions of the assailant's clothes and her

recollection at trial of those accounts was inexact.  In his defense case, petitioner called an

---

[5] This fact was explored at the pre-trial suppression hearing.  The court initially ruled that
Kayla's viewing of the video before the lineup was suggestive and then held an independent
source hearing, where Kayla testified that she did not see the face of the man on the bicycle in
that video.  The hearing court found that "Kayla made no real identification of [petitioner] from
the surveillance video she viewed before the lineup," having identified him in the video "only
from his clothing."  Hearing Decision dated March 16, 2010, at 8.  Therefore, the court ruled,
"her viewing of the video could not taint either the . . . lineup or her prospective in-court
identification, as [petitioner] was not, and will not be, wearing the identifying striped polo shirt."
Id. The hearing court granted petitioner's motion for reconsideration but took no further evidence
and upon reconsideration, adhered to its original decision.  Hearing Decision, October 1, 2010.

officer who testified that in her initial interview, Kayla did not mention the black and white striped polo shirt and jeans, but said that the assailant wore tan pants and a green shirt.  1042-43.[6]

<u>Scene videos</u>.  Clips from the exterior surveillance video cameras of the Scandals club, Petrocelli Electric, and Michael Masseo Electrical were introduced.  Four clips from the Scandals footage, assembled chronologically, show (i) Eduarda and Kayla walking on Queens Plaza North in front of the club at 9:48 a.m.; (ii) the pair walking further down the same street approximately one block before the scene of the attack; (iii) a man, on a bicycle, wearing jeans and a horizontally striped shirt, turning onto Queens Plaza from a side street Eduarda and Kayla had just crossed; and (iv) Kayla running back toward Scandals while the bicyclist rode off toward the Queensborough Bridge.  The Masseo Electric video showed the same man on a bicycle heading towards Queens Plaza North at 9:47 a.m., and the Petrocelli clip showed the same man on a bicycle on Queens Plaza North at 9:51 a.m.[7]

The state conceded that this video evidence, which showed generally that Eduarda and Kayla did not invent the story of a bicyclist, did not capture petitioner's face.  1208.  Its probative value, the state urged, was the clothing worn by the bicyclist, which the state asked the jury to compare with the clothing worn by petitioner in the Greenpoint Video (discussed here

---

[6] A witness to the aftermath of the crime, Joel Lassiter, was driving on Queens Plaza North at approximately 10 am and noticed someone on the sidewalk "collapsing" and someone else "of small stature" running "in a dead sprint" up the street.  739, 741.

[7] The detective who secured the Scandals video testified he routinely assesses the accuracy of the clock on any surveillance footage by checking it against the time on his cellphone.  The clock on the Scandals video was 22 minutes fast.  530-32; 1067-68.  The owner of Petrocelli Electric testified that the clock on his footage was accurate, 888, while the owner of Masseo Electric had no reason to doubt the accuracy of the time on his footage. 1001.  The Court has been provided with the Scandals footage but not the other scene videos.

next).  See, e.g., 1208 ("Compare that clothing. That is the importance of the video evidence.").

With respect to the scene videos, the state described their contents in summation, without

objection,  as follows:

> All three of them show you the clothing that the perpetrator, the stabber is
> wearing: the light blue jeans with the black and white striped polo shirt with the
> black sneakers.  And if you look real close you will see there's a white emblem on
> the black sneakers…You know that this is the stabber because if you follow the
> video evidence you know that at 9:47 the bicyclist comes down 24th Street, turns
> onto Queens Plaza North and then follows Kayla and Eduarda to 22nd
> Street….And you see this person come up behind Kayla and Eduarda on the
> video.  You see Eduarda fall into the street and you see the bicyclist ride off
> underneath the bridge.  1209.

The Greenpoint video.  It was undisputed that petitioner resided at the Greenpoint Hotel

on Manhattan Avenue in Greenpoint, Brooklyn, where he was arrested at approximately 5:00

p.m. the day after the crime.  937-38, 944, 946; 1108-09, 1111-12.  The hotel, a single room

occupancy ("SRO") residence of approximately 200 rooms, had several security cameras,

including an external camera at the main entrance on Manhattan Avenue.  624-26.  Eduardo

Suren, the building's fire safety director who worked the front desk, testified that as of June

2008, petitioner had been a resident for approximately one year, and had a bicycle that he kept

with other residents' bicycles around the corner.  633.

The day after petitioner's arrest, Detective John Asam recovered surveillance video

recorded by the hotel's external surveillance camera that showed a man wearing blue jeans and a

black and white horizontally-striped polo shirt leaving the main entrance at 8:05 a.m. on June 22,

2008—i.e., approximately three hours before the crime occurred.  580-88, 597-98.  Suren

identified petitioner as the man in two still photographs taken from the video.  634.  On cross-

examination, when petitioner asked Suren whether it was "possible that the person in that photo

is someone who looks like me instead of me," Suren replied, "No."  637.

The subject of the time and date on the hotel footage was explored on direct and cross-examination.  Detective Asam testified:

> When we go to a location to download video usually when we walk in it's showing a live shot and a lot of times the store owner . . . doesn't really take care of his video equipment and update the times and the time will actually be off from real-time.  So the first thing we do when we go into a location [is] look at the live time on the live video and determine how real-time is off from the time-stamp of the video.  585.

The detective compared the hotel camera's "live" or "real" time to the time on his cellphone and concluded that the hotel's equipment "was ahead one day and one hour, so actually 25 hours ahead."  586.  Thus, although the video of petitioner exiting the hotel that was played at trial stated "June 23, 2008" (the day after the crime) and "8:05 a.m.," Asam testified that the "real time" of that recorded event was 25 hours earlier, or 7:05 a.m. on June 22, 2008, the day of the crime.  592-94.

Petitioner examined Detective Asam about a report, in petitioner's possession, that concerned the Greenpoint Hotel's surveillance system's clock.  601-604.  Detective Asam testified that he recalled having reviewed a report, prepared by a Detective Karl Kratzer, that indicated that the hotel equipment's clock was one hour behind, not 25 hours ahead, but also that that document was "an error report."  602.  Detective Kratzer did not testify and the court denied petitioner's request to admit the report.  604.  Asked on redirect, "How is it that you recall that the time stamp is one day and one hour off?" Detective Asam testified, "I just remembered doing this job with Detective Reid.  I knew it was way off and when I reviewed Detective Reid's DD5, I knew the exact time, it was off, because Detective Reid made a real clear notification on his DD5.  610-11.

Greenpoint Hotel manager Hillel Porges, who also had access to the hotel's surveillance cameras, testified that to the best of his knowledge, the cameras recorded accurately, that the timer was "usually" accurate but that there were also periods of time when it was not.  627-28.  Porges did not recall whether the system's timer was accurate in June 2008.  Suren, too, was asked whether the hotel's camera's clock was usually correct; he "couldn't answer that question" because "[t]he owners had control of that."  637.

To corroborate Detective Asam's testimony that the hotel video clock was 25 hours ahead—and that the video showing petitioner exiting the Greenpoint Hotel was, indeed, from Sunday, June 22nd, the morning of the crime, and not the equipment-indicated time—the state introduced evidence of petitioner's whereabouts at the latter day and time (i.e., 8:05 a.m. on Monday, June 23rd).  Akash Chabra, general manager of Shelter Express, testified that during June 2008 petitioner worked for that company installing posters in New York City bus shelters.  His regular shift was Monday to Friday, 5:00 a.m. to 1:00 p.m., and he did not work weekends.  The company's records confirmed that on June 23, 2008, petitioner reported to work in Long Island City at 5:00 a.m. and was promptly assigned 36 posters to install in the Bronx.  The records further confirmed that during his shift on June 23, petitioner stopped at shelters in the Bronx every 20 to 30 minutes from 5:45 a.m. through at least 9:16 a.m., and signed out at 1:05 p.m.  893-903, 1015-16.[8]

---

[8] In summation, petitioner affirmatively argued (although he had not testified) that "the man recorded at [the Greenpoint Hotel] was not me," 1177, and suggest that it could not have been him because—relying on his theory that the date stamp of June 23 was correct (and at most an hour ahead)—he was at his job in the Bronx on June 23.  See id. at 1177 ("The police went to my workplace to verify that I had been at work…that should have been the end of it.").

9

Evidence from the Oh So Good Deli.  Police recovered from petitioner's wallet an ATM card and an ATM receipt from a machine inside the Oh So Good Deli, located approximately 6/10 mile from the crime scene, reflecting a transaction conducted on June 22, 2008 (the day of the crime) at 10:05:55 a.m. (approximately fifteen minutes after the crime).[9]  Police then examined the store's surveillance footage starting at approximately 9:30 or 9:45 a.m.  Petitioner was first sighted on the video (inside the deli) at 10:01 a.m. and seen leaving at 10:31 a.m.  1063-64.  In this footage, petitioner is wearing shorts and a t-shirt, not the horizontally striped shirt and blue jeans worn by the bicyclist-assailant in the scene videos.

The blue jeans, striped shirt, and bicycle in those videos were never recovered.  Nor was a weapon.  In summation, the prosecution acknowledged that it did not know what happened to these items, suggesting to the jury that petitioner disposed of them immediately after the crime in furtherance of his plan to create an apparent alibi.   See, e.g., TT at 1216 ("You know that this is what he's wearing at 7:00 and if you check out the video from the deli you know that he's wearing shorts and a t-shirt at 10:01. Why is he changing his clothes after three hours? . .  He knew that this outfit was evidence.").  The summation urged the jury to notice that in the Oh So Good Deli video petitioner was wearing the same black sneakers with the white emblem that the bicyclist was wearing in the scene videos.  1209, 1216.  The state also suggested that because petitioner lived in Brooklyn, far from the crime scene, his proximity to the scene so close to the time of the crime was itself inculpatory.  Petitioner, by contrast, argued in his summation that he could not have been the bicyclist in the scene videos because he was in the Oh So Good Deli

---

[9] As discussed infra at note 22, petitioner called a graphic artist who testified that the shortest route for a bicyclist to take between the crime scene and the Oh So Good Deli was .69 miles and the fastest route .723 miles. 1118-33.

only minutes later and in different clothing.  See 1188 ("He would have to take off his shoes, take off his straight leg jeans and shirt and put on a pair of shorts and a t-shirt and then put on his shoes again . . . faster than humanly possible before appearing on videotape.").

Petitioner's Statement.  The day following petitioner's arrest, while Lieutenant Edward Keough was conducting a routine inspection of the holding cells at the 114th precinct, petitioner "looked at [the detective] and made a statement."  940.  Keough testified that petitioner "said, in sum and substance," that he "had a problem with" a "bald guy in the building" who "had a Chinese guy buy his bike and clothing."  940, 983.  Keough did not take notes of the statement.

The Molineux Evidence.[10]  Kevin Scott Hall testified that just after midnight on October 7, 1994, as he was walking down West 45th Street in Manhattan, he noticed police cars blocking traffic. As Hall approached Tenth Avenue, petitioner rode up to him on a bicycle, stopped beside him and, while straddling his bike, asked if Hall knew what the commotion was about.  914-15. As Hall began to answer, he felt "like a punch" to his chest, and believes petitioner lunged at him a second time before riding off.  915, 916.  Hall walked toward the nearby police cars and told an officer he thought someone had tried to stab him.  The officer told him he was bleeding and had him taken to the hospital, where he remained for three days for treatment of a three-inch-deep wound.  Hall identified petitioner at the time and, when testifying in the Queens County trial in

---

[10] "The familiar Molineux rule states that evidence of a defendant's uncharged crimes or prior misconduct is not admissible if it cannot logically be connected to some specific material issue in the case, and tends only to demonstrate the defendant's propensity to commit the crime charged." People v. Cass, 18 N.Y.3d 553, 559 (2012).  Such evidence is admissible, however, when it tends to establish motive, intent, the absence of mistake, a common scheme or plan, or identity.  Id. The court accepted the prosecution's argument that the modus operandi of the crimes was sufficiently unique to make the evidence probative on the issue of identity, and gave the jurors the appropriate limiting instruction. 912, 1021.

11

2011 Hall again identified petitioner as his assailant because of "[his] eyes," which had a certain "look" or "intensity."  925, 928.  When Hall offered that "there's a kind of sincere look to your eyes that is very misleading," petitioner asked Hall to explain what he meant, and Hall added: "I think it has to do with the situation and the way you purposely looked at me and asked me a question and sincerely wanting an answer and then stabbing me with the knife."  929.

Yehoram Uziel testified that on September 29, 1994, he was walking with two friends on Fifth Avenue in Manhattan, heading toward 44th Street, when a man riding a bicycle came very close to him, stopped, straddled his bike, stabbed Uziel in the chest with what Uziel assumed was a knife or ice pick, and then rode away.  (1022-26, 1029, 1032).  Uziel received five stitches but suffered no internal organ damage.  He identified petitioner in a 1994 lineup and in the 2011 Queens County trial testified that, "I see it in your eyes seventeen years later," and that, "[i]t's not that your eyes are different from anybody else's.  It's this look that I remember when I almost died."  1027, 1029.[11]

Medical Evidence.  EMT Christopher Kagenaar received a call at 9:55 a.m. to respond to an emergency on Queens Plaza North at 22nd Street and, upon arrival, observed Eduarda lying on the street, bleeding from a stab wound on the left side of her chest.  561-67.  By the time paramedic Christopher Lipkin arrived at 10:04 a.m., Eduarda had been moved into the ambulance, was unconscious, her blood pressure was low, and her breathing was not "adequate enough to sustain life."  545-55, 459-63, 465-69, 472-73.  Because of Eduarda's struggles with

---

[11] Petitioner pled guilty in connection with the Hall and Uziel incidents, and was incarcerated from October 1995 to October 2004. (52, 57, 65-66, 69, 70).  That conviction was also used as a basis to adjudicate petitioner a second violent felony offender following his conviction for the Queens County crimes.

breathing, Lipkin performed an examination and determined that there was diminished activity in

Eduarda's left lung, and that she had tracheal deviation (i.e., when, upon injury to one lung, the

trachea realigns with the working lung). 467-68. Upon Eduarda's arrival at New York Hospital,

she was, according to cardiothoracic surgeon Dr. Subroto Paul, "in an active state of trying to

die" and, because she would have died before she could be moved, her chest was opened in the

emergency room to relieve the pressure on her heart. Dr. Paul diagnosed Eduarda as having a

blood clot in the pericardial sac of her heart and a hole in her left ventricle, which he then

repaired. Eduarda remained hospitalized for two weeks. 1076, 1079-84, 1088-89.

## B.      Appeal and State Post-Conviction Proceedings

The brief for petitioner prepared by appellate counsel argued that the trial court

improperly denied his motion to present expert testimony about factors affecting the reliability of

eyewitness identification. Unanimously affirming petitioner's conviction and sentence, the

Appellate Division, Second Department rejected the claim, holding that:

> there was sufficient evidence connecting [petitioner] to the crimes to obviate the
> need for expert testimony, including surveillance videos, physical evidence
> placing [petitioner] in the vicinity of the crime shortly after the crime occurred,
> and evidence probative of [petitioner's] identity as the perpetrator in this case
> admitted pursuant to <u>People v. Molineux</u>…demonstrating that [petitioner] had
> committed crimes in the past by using a distinctive and unique modus operandi
> that was nearly identical to the manner in which the crime was committed in this
> case.

<u>People v. Granger</u>, 122 A.D.3d 940, 941 (2d Dep't 2014).[12] Petitioner also filed two

supplemental pro se submissions in support of his appeal—a 36-page brief advancing 22

numbered claims and several sub-claims (e.g., claim number 12 contains 14 sub-claims, while

---

[12] Appellate counsel also raised, unsuccessfully, the <u>Payton</u> claim and related suppression issues
that were advanced before trial. <u>See</u> <u>Granger</u>, 122 A.D.3d at 940-42.

13

claim numbers 16 and 21 each advance 7 distinct claims), along with a 30-page "Dismissal with Prejudice Worksheet" that includes his hand-drawn sketches of the lineup and the 114th precinct where he made his statement to Lt. Keough.  The principal theme of these submissions, like petitioner's arguments at trial and the gravamen of his habeas petition, is that the identification evidence introduced at trial was either perjured, unreliable, or improperly obtained.  A second principal recurring claim in these materials, also readvanced here on habeas, is that the adverse rulings at the suppression hearing (on the legality of his arrest, and admissibility of the physical evidence and Kayla's lineup identification) are the result of the alleged ineffectiveness of pre-trial counsel.

The Appellate Division's decision, referencing only petitioner's "pro se supplemental brief" but not the Dismissal with Prejudice Worksheet, summarily ruled that all but one of these supplemental claims were "without merit."  Id.  Treating the ineffective assistance claim separately, the court ruled that the claim was "mixed" because it was based, in part, on matter appearing on the record, and in part on matter outside the record.  Id. at 942.  The court rejected the on-the-record branch on the merits, and advised petitioner to pursue the off-the-record branch in a CPL § 440.10 proceeding.  Id.  The New York Court of Appeals later denied leave to appeal. People v. Granger, 25 N.Y.3d 989 (2015).

Petitioner then moved pro se to vacate his conviction pursuant to C.P.L. § 440 claiming he was denied the effective assistance of pre-trial and standby counsel.  He also raised approximately eight other grounds.  The court denied the motion in an order dated December 9, 2015, and set forth its findings of fact and conclusions of law in a 12-page Decision & Order dated February 22, 2016.  The Second Department, by order dated July 28, 2016, denied leave to appeal the denial of Section 440 relief.

14

In June 2016, in a 57-page pro se submission, petitioner moved for a writ of error coram nobis, citing a host of allegedly meritorious arguments that appellate counsel did not advance. The Appellate Division denied the motion by summary order.  People v. Granger, 147 A.D.3d 871 (2d Dep't 2017).  The New York Court of Appeals denied leave to appeal.  People v. Granger, 29 N.Y.3d 1080 (2017).

On or about April 6, 2021 (after the commencement of this habeas proceeding), petitioner filed a second motion to vacate pursuant to CPL § 440 in which he advanced claims that are largely repetitive of those already advanced in his earlier state submissions.  The court denied the motion summarily by Decision & Order dated October 18, 2021, finding that the claims were barred because they were or could have been raised on direct appeal or in his prior 440 motion. By application dated October 27, 2021, and supplemental affidavit dated December 29, 2021, petitioner moved for re-argument, asking the court to reconsider at least twelve separate inquiries.  The court denied the application by Decision & Order dated April 18, 2022, finding that the claims denied in the October 2021 order were "largely duplicitous of his previous motions and other filings" and that the motion to re-argue "merely reasserts many of the same claims and subclaims that were raised in other proceedings."  Id. at 3, 4.[13]

## C.    The Federal Habeas Proceeding and Subsequent State Court Filings

Petitioner filed his habeas application in this Court on or about February 13, 2017.

---

[13] The April 18, 2022 order notes that petitioner served a notice of appeal of the October 18, 2021 order denying 440 relief but did not seek leave to appeal from the Appellate Division, and that the Appellate Division ordered  petitioner to show cause why his appeal should not be dismissed because no appeal of right exists from the denial of post-conviction relief, and that petitioner submitted an affidavit and brief to the Appellate Division on February 20, 2022.  The matter is believed to be still pending.

Between June 15, 2017, when respondent filed its answer to the petition, and today, petitioner

has filed over fifty additional motions, letters, and demands in this Court, including repeated

requests for counsel, which have been denied, and for an evidentiary hearing, which have also

been denied more than once. See, e.g., ECF 47 (Order dated August 30, 2019, stating that "[t]he

Court has examined the written submissions and it is not evident that a hearing is necessary")

and ECF 84 (Order dated March 10, 2021, denying several motions for an evidentiary hearing).

By order issued April 29, 2022, the Court denied petitioner's motion for reconsideration of the

denial of his motions for an evidentiary hearing and for leave to take an interlocutory appeal of

that denial.

On or about September 2, 2020, petitioner filed a motion to amend, correct or supplement

his petition. ECF 73. By order issued June 24, 2021, the Court directed petitioner to file, by

August 2, 2021, his proposed Amended Petition along with a letter detailing which claims were

new and how the new claims share a common core of operative facts with those in the original

petition. ECF 86. The Court then granted petitioner's request to extend the filing deadline to

October 4, 2021, and, because it was not clear whether petitioner had received all Court orders,

the Court *sua sponte* extended petitioner's deadline to November 5, 2021. ECF 96. By letter

filed November 11, 2021, however, petitioner stated, "I do not wish to amend the Petition for a

Writ of Habeas Corpus filed on or about February 13, 2017," ECF 101, and to date has not

offered an amended pleading. By letter dated November 30, 2021, respondent asked that the

petition be considered fully briefed.

In November 2016—several months before commencing this habeas proceeding—

petitioner filed a separate application for a writ of habeas corpus in the Southern District of New

York. Those papers challenge his 1995 convictions for second-degree assault obtained in New

16

York Supreme Court upon his plea of guilty in connection with the Hall and Uziel attacks.

Petitioner challenges his 1995 conviction on the ground that (i) his trial counsel was ineffective

when advising him to accept the plea; (ii) he is actually innocent of second-degree assault

because, based on the victims' testimony at the 2011 Queens County trial, the state could not

have established that the victims suffered serious physical injury or that petitioner possessed the

requisite deadly weapon or dangerous instrument; and (iii) the use of the 1995 convictions as the

basis for adjudicating him a second violent felony offender in the 2011 Queens proceeding

resulted in a total sentence that was cruel and unusual.  A final claim, that the admission of prior

bad acts evidence under Molineux was erroneous, is addressed to the Queens County conviction.

By order dated March 2, 2017, then-Chief Judge Colleen McMahon of the Southern

District held that petitioner "cannot obtain habeas corpus relief in connection with his 1995 New

York conviction."  Granger v. Artus, 16 CV 8862 (S.D.N.Y. Mar. 2, 2017).  Judge McMahon

relied on the rule that "[w]here a prior conviction is later used to enhance a future sentence, the

defendant generally may not challenge the enhanced sentence 'on the ground that the prior

conviction was unconstitutionally obtained.'"  Id. at 3 (quoting Lackawanna Cnty. Dist. Atty. v.

Coss, 532 U.S. 394, 403-404 (2001)).  As stated by Judge McMahon, "[t]he exception to this rule

arises only if the defendant was denied his right to counsel, is actually innocent but could not

have uncovered evidence of this fact sooner, or he cannot be faulted for failing to obtain timely

review of a constitutional claim."  Id. (quotations omitted).  Judge McMahon concluded that

petitioner "is unable to satisfy" any of the three Lackawanna exceptions because "he was

represented by counsel [in the 1995 case], he does not assert any facts suggesting that evidence

of his innocence was previously unavailable, and he does not assert that government action

prevented him from filing a timely constitutional claim."  Id. at 3-4.

17

Judge McMahon further concluded, however, that the Southern District petition "could be construed as challenging [p]etitioner's Queens County conviction," and transferred the matter to this Court,  id. at 7, where it was initially assigned a separate docket number, 17 CV 1437, and then, by order dated April 28, 2017, was consolidated with the instant proceedings.

Since the reassignment of this matter to the undersigned in May 2022, petitioner has written five additional letters to three different judges of this Court regarding his claims.  ECF 108-112.

## GENERAL HABEAS STANDARDS

Federal habeas relief is authorized "only on the ground that [an individual] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §2254(a). See generally Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), enacted in 1996:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. § 2254(d).

As recently summarized by the Second Circuit, citing the seminal Supreme Court

18

constructions of the statute,

> A claim is "adjudicated on the merits" if the state court ruled on the substance of the claim rather than on a procedural ground. A decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. A decision is an "unreasonable application" of clearly established federal law if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Jordan v. Lamanna, 33 F. 4th 144, 150 (2d Cir. 2022) (cleaned up).

What few habeas petitioners appreciate, however, is exactly how formidable this standard is. First, "[a] legal principle is 'clearly established within the meaning of this provision only when it is embodied in a *holding* of th[e Supreme] Court," Thayler v. Haynes, 559 U.S. 43, 47 (2010) (emphasis added), "as opposed to the dicta," Williams v. Taylor, 529 U.S. 362, 412 (2000), or the holdings of federal appellate courts. Carey v. Musladin, 549 U.S. 70, 74 (2006). Second, the writ is not available "simply because . . . the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Williams, 529 U.S. at 411. "Rather, the writ should be granted on grounds of unreasonableness only if 'the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Jordan, 33 F. 4th at 151 (quoting, Harrington v. Richter, 562 U.S. 86, 103(2011)). "[R]easonable arguments on both sides" are "all [the state] needs to prevail [under] AEDPA." White v. Woodall, 572 U.S. 415, 427 (2014).

The statute "erects [this] formidable barrier to federal habeas relief," because it embodies "a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights ... and are thus presumptively competent [ ] to adjudicate claims

arising under the laws of the United States." Burt v. Titlow, 571 U.S. 12, 19 (2013).  Therefore,

federal habeas courts "will not lightly conclude that a State's criminal justice system has

experienced the extreme malfunction for which federal habeas relief is the remedy."  Id. at 16

(cleaned up).

## DISCUSSION

## I.  The Brady Claim

Petitioner claims that he was denied his due process rights under Brady v. Maryland, 373

U.S. 83 (1963) by the state's withholding of Detective Kratzer's report indicating that the

Greenpoint Hotel's surveillance camera clock was one hour behind real time.  Petitioner

presented this claim on direct appeal in his pro se supplemental brief and the Appellate Division

rejected it.  Granger, 122 A.D.3d at 942 ("The [petitioner's] remaining contentions, raised in his

pro se supplemental brief, are without merit.").  He raised it again in his first CPL §440.010

proceeding, where it was again rejected on the merits. Dec. & Order dated Feb. 22, 2016 at 3

("this Court summarily denies" as "previously determined" the claim "that the prosecution

committed a Brady violation when it failed to disclose Detective Kratzer's video authentication

report").  These summary rulings are merits adjudications to which AEDPA deference applies.

Harrington v. Richter, 562 U.S. 86, 98 (2011); Jimenez v. Walker, 458 F.3d 130 (2d Cir. 2006).

To prevail, therefore, petitioner must show that the state court's rejection of his claim was

contrary to or an unreasonable application of Brady or other Supreme Court holdings.

In Brady, the Supreme Court held that "the suppression by the prosecution of evidence

favorable to the accused upon request violates due process where the evidence is material either

to guilt or to punishment."  373 U.S. at 87.  The Court further held that, "[f]avorable evidence is

material, and constitutional error results from its suppression by the government, if there is a

reasonable probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different." Kyles v. Whitley, 514 U.S. 491, 433 (1995) (cleaned

up). See also Banks v. Dretke, 540 U.S. 668, 698 (2004) ("Our touchstone on [Brady]

materiality is Kyles."). Kyles cautions that its materiality standard "does not require

demonstration by a preponderance that disclosure of the suppressed evidence would have

resulted ultimately in the defendant's acquittal." 514 U.S. at 434. Rather, a Brady violation is

established "by showing that the favorable evidence could reasonably be taken to put the whole

case in such a different light as to undermine confidence in the verdict." Id. at 435.

The Appellate Division's rejection of petitioner's Brady claim is unquestionably not an

unreasonable application of these Supreme Court holdings. Indeed, the extent to which Brady

concerns are even implicated here is minimal because, without reaching the issues of favorability

and materiality, the evidence at issue was *not* suppressed. Although the record does not enable

this Court to determine when a demand was made and exactly when disclosure occurred, it is

irrefutable that petitioner had Kratzer's report in hand in time to cross-examine Detective Asam

about it and to elicit the feature of it that petitioner apparently considers to be favorable

(presumably, that it could tend to support his assertion that he could not have been the man in the

Greenpoint video because he was at work in the Bronx on the morning the video depicts).

Petitioner also says that even if the report was disclosed before trial, his "constitutional

rights were still denied because the report was withheld from him until he was no longer able to

implement his own trial strategy, *i.e.*, suppress the critical video before trial or before it was

viewed by jurors." ECF No. 1 at 12 (cleaned up). Brady is not offended because petitioner is

simply mistaken in his belief that the Kratzer report offered grounds to exclude the Greenpoint

video. As reflected in the trial court's ruling when the video was received into evidence upon a

21

proper foundation, the report's assessment that the video's clock was an hour behind—like Detective Asam's testimony that the clock was 25 hours ahead—would go to weight, not admissibility.  See 589-90 (when petitioner objected to the video's admission, stating, "I have conflicting information about the accuracy of the time," the court overruled the objection, admitted the video, and advised petitioner that that objection "is for you to cross-examine about").  Additionally, whatever shadow petitioner hoped the report might cast on the Greenpoint video or Detective Asam's testimony about the accuracy of the hotel equipment's clock was fully explored at trial.  In short, there is no Brady violation because nothing in the record suggests that disclosure of the report at some earlier point could have "put the whole case in such a different light as to undermine confidence in the verdict."  Kyles, 514 U.S. at 435. Petitioner's Brady claim therefore fails to state a basis for federal habeas relief.

## II.    The Rosario Claim

Petitioner claims that he was unfairly prejudiced by the late or non-disclosure of several witnesses' prior statements as required by People v. Rosario, 9 N.Y.2d 286 (1961), cert. denied, 368 U.S. 866 (1961).  See Pet'n, ECF No. 1 at 13-16.  See Rosario, 9 N.Y.2d at 289 (announcing the rule that "entitles the defense to examine a witness's prior statement, whether or not it varies from his testimony on the stand, as long as the statement relates to the subject matter of the witness's testimony and contains nothing that must be kept confidential").  The rule "turns largely on policy considerations," id. at 289, and was codified by the state legislature.  See CPL §§ 240.44(1) and 240.45(1)(a), eff. until Jan. 1, 2020, recodified at §§ 245.25 et seq.

Petitioner says the state failed to disclose Eduarda Oliva's grand jury testimony before the Molineux hearing, and failed to disclose before trial the prior statements of Lt. Keough, Det. Asam, Shelter Express co-worker Virtudes Gonzalez, Molineux witnesses Uziel and Hall, and

Greenpoint Hotel fire safety director Eduardo Suren.

Copious as petitioner's state courts submissions are, it appears that, except for the branch addressing Oliva's grand jury testimony, he did not exhaust his Rosario claim in state court and so cannot advance it here as a basis for federal habeas relief.  See  28 U.S.C.§ 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that [ ] the applicant has exhausted the remedies available in the courts of the State"); Picard v. Connor, 404 U.S. 270, 275 (1971) (discussing exhaustion requirement); Daye v. Attorney Gen. of State of New York, 696 F.2d 186, 191 (2d Cir. 1982) (same).[14]  Even if the Rosario claim were properly before the Court,[15] it would not present a basis for habeas relief because it arises wholly under state law. See, e.g., Ward. v. Lee, 2020 WL 6784195, at *12 (E.D.N.Y. Nov. 18, 2020) (collecting cases). As the collected cases further discuss, the similarity between the Rosario rule and the federal rule announced in Jencks v. United States, 353 U.S. 657 (1957) does not change this analysis.  See

---

[14] Petitioner's claim that "the district attorney withheld the victim's contradictory grand jury statements" from the Molineux hearing appears at page 21 of his pro se supplemental brief. Petitioner also raised the claim regarding Eduarda Oliva's statements and Lt. Keough's in his first CPL § 440 motion, where the court held that they were procedurally barred there because they were record-based and should have been raised on appeal.  Dec. & Order dated Feb. 22, 2016 at 4-5.

[15] Because the Rosario claim is record-based and should have been raised on appeal, it is deemed exhausted but procedurally barred.  Guilifield v. Sup't Green Haven, 2022 WL 1486797, at *12 (S.D.N.Y. May 11, 2022) (cleaned up) (collecting authorities).  Petitioner advances a claim of ineffective assistance of appellate counsel as the requisite cause to lift that procedural bar.  He exhausted that claim through his state court coram nobis application, but because the Appellate Division rejected that claim, that claim cannot excuse the default, and because petitioner has not alternatively shown that he is actually innocent, the unexhausted portions of the Rosario claim are barred. See generally Coleman v. Thompson, 501 U.S. 722, 750 (1991); Murray v. Carrier, 477 U.S. 478, 496 (1986).

Ward, 2020 WL 6784195, at *12 (observing, inter alia, that even the Jencks rule "has not been construed as constitutional in nature") (internal citation and quotation omitted).

Petitioner's Rosario claim is therefore not cognizable in this federal habeas proceeding.

In any event, although respondent asserts that "petitioner has failed to establish that there were, in fact, any prior statements of the cited witnesses," Resp. Mem. at 32, petitioner did cross-examine several of these witnesses at trial about their prior statements.  See, e.g., 824-56 (lengthy cross-examination of Eduarda Oliva including about statements made during her police interview, 829, and in the grand jury, 853); 941-990 (50-page cross-examination, following 4-page direct, of Lt. Keough, including about his testimony at the suppression hearing); 1027 (cross-examination of Molineux witness Uziel about his grand jury testimony).

In sum, petitioner's Rosario claim fails to state a basis for federal habeas relief.

## III.    Sufficiency

Petitioner asserts that there was insufficient evidence (i) of his identity as the assailant, (ii) that Eduarda suffered the "serious physical injury" required for first-degree assault; and (iii) that he "endangered" Kayla.  Pet'n, ECF 1 at 18-20.

*Identification*.  The principal themes driving this petition and petitioner's ensuing prolixity are that he did not commit the crime, and, for all the myriad reasons explored and argued at trial and asserted in his lengthy pro-se submissions in state court, that the extensive identification evidence against him was perjured, unreliable, or improperly obtained.  Embedded in these arguments are what he offered the jury as species of alibis, namely, that he could not have committed the crime and also been in the Oh So Good Deli, more than .6 mile away, as soon as 8 minutes later in different clothes, and that he could not have been the man in the Greenpoint video wearing the same clothes as the assailant the morning of the crime because, as

24

reflected on the equipment's clock, the event it captured (his departure from the hotel) occurred the day after the crime when he was at work in the Bronx.

Without reaching the claim's uncertain procedural status,[16] the Court rejects it on the merits, see 28 U.S.C. § 2254(b)(2) (a federal court may deny a writ of habeas corpus on the merits even if the petitioner has failed to exhaust state remedies), concluding that the Supreme Court's standard in Jackson v. Virginia, 443 U.S. 307 (1979) is dispositive whether applied de novo or with AEDPA's doubled deference.[17]  Under Jackson,

> the critical inquiry ... does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

Id. at 318-319 (internal quotations and citations omitted) (emphases in original).

Despite petitioner's persistence, zeal, and prolixity, a federal habeas proceeding is not a second trial, and the habeas court's role is not to redo the work of the jury that returned a guilty verdict.  All of the quarrels petitioner has with the evidence were raised at trial; the jury that convicted him was properly charged that his raising of an alibi did not shift the burden of proof,

---

[16] Respondent argues that this theory is unexhausted because petitioner did not present a claim labeled "insufficiency" to the state courts. But, as noted, even without that label, the theme permeating petitioner's many state court submissions—most notably his Dismissal With Prejudice Worksheet—is a challenge to the identification evidence in the principal ways asserted here and at trial (i.e., as unreliable, perjured, or improperly obtained).

[17] See Cavazos v. Smith, 565 U.S. 1, 2 (2011) ("the deference to state court decisions required by § 2254(d)" is to be "applied to the [ ] already deferential review" of Jackson).

1248, and was also instructed at length about what factors to consider in assessing the accuracy of identification testimony.  1249-51.  It is sufficient, to defeat petitioner's challenge, that this Court is able to say that *a* rational jury so instructed could readily conclude, on the basis of the compelling victim testimony and other identification evidence compiled above, that it was petitioner who stabbed Eduarda.  Accordingly, petitioner's challenge to the sufficiency of the evidence of identification does not state a basis for federal habeas relief.

*Serious physical injury*.  Under New York law, a person is guilty of the crime of assault in the first degree when "[w]ith intent to cause serious physical injury to another person, he causes such injury to such person . . . by means of . . . a dangerous instrument."  PL § 120.10(1).  "Serious physical injury" is "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."  PL§ 10.00(10). The trial court's charge to the jury, to which petitioner did not object, tracked the statutory language almost verbatim.  1254.

In light of the medical evidence and controlling standards, this branch of petitioner's sufficiency claim is frivolous.  His attack rendered Eduarda unconscious and—in the opinion of both the first responders and her cardiothoracic surgeon, whom the jury was entitled to credit—on the brink of death.  Petitioner makes the reckless, speculative assertion that because a stab wound penetrating the heart would have caused Eduarda's death within minutes, the life-threatening injury for which she received surgical intervention must have occurred at the hospital rather than at the crime scene.  The trial evidence plainly said otherwise.

Seizing on paramedic Lipkin's observation that Eduarda was struggling to breathe at the scene, and his ensuing opinion that Eduarda suffered injury to her left lung, petitioner also argues

that the prosecution impermissibly "permit[ed] some jurors to convict based on a lung injury and others to convict based on a heart injury." ECF 1 at 20, 19. But petitioner is mistaken. The testimony of Eduarda's cardiothoracic surgeon and the New York Hospital medical records established that there was no lung injury. As the prosecution argued in summation: "[Y]ou are going to have to decide whether or not Eduarda Oliva sustained a serious physical injury . . . you have her medical records" and "you have the testimony of her doctor who told her what he had to do to repair her injury. What was her injury? A tear to her pericardium. A tear to her left ventricle in her heart." 1220. In sum, petitioner's challenge to the sufficiency of the evidence of serious personal injury fails to state a basis for federal habeas relief.[18]

_Endangerment_. Petitioner asserts that "[t]here is a lack of evidence supporting mental, moral and physical endangerment," that Kayla was "not touched, not threatened, and not spoken to by the perpetrator," and that she "did not see the actual stabbing." ECF 1 at 20. Petitioner presented this claim in his pro se supplemental appellate brief, so the Appellate Division's summary rejection of all the claims in that brief, Granger, 122 A.D.3d at 942, is a merits adjudication subject to doubled AEDPA deference. Cavazos, 565 U.S. at 2.

Under N.Y. Penal Law § § 260.10[1], "[a] person is guilty of endangering the welfare of a child when," relevant here, "[h]e or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old." As the New York Court of Appeals has held, "[a]ctual harm to the child need not result for liability under the statute to attach, it being sufficient that the defendant act in a manner which is likely to result in

---

[18] Respondent argues that this branch of the sufficiency claim is also unexhausted and procedurally barred. But petitioner did expressly advance this theory in the "Dismissal with Prejudice Worksheet" submitted on direct appeal. See ECF 13-1 at 69-70.

harm to the child, knowing of the likelihood of such harm coming to the child." People v. Simmons, 92 N.Y.2d 829, 830 (1998). See also Matthews v. Barr, 927 F.3d 606, 618 (2d Cir. 2019) ("'The Legislature specifically recognized that behavior that was *likely* to produce harm to a child's physical, mental or moral well-being fell within its sweep as long as the defendant was *aware* of its potential for harm to a child'") (quoting People v. Johnson, 95 N.Y.2d 368, 372 (2000) (emphasis in original)).  The trial court's charge comports with the statutory language and cited caselaw.  1259-60.

The Appellate Division did not unreasonably apply Supreme Court law, or make an unreasonable determination of the facts in light of the evidence, when it rejected petitioner's sufficiency challenge to his endangerment conviction.  Indeed, the claim is frivolous in light of the controlling standards.  Kayla testified that she was at her mother's side during the attack, and that she heard the "thud" of petitioner's fist striking her mother's chest and then her mother screaming for help.  The likelihood of injury to the girl's mental welfare is self-evident and knowledge of its likelihood reasonably imputed to the attacker.  But even without Kayla's testimony, a rational juror could readily conclude that a man who stabs a woman accompanied by a minor knows that harm to the minor's moral, mental, or physical welfare will likely ensue. In sum, petitioner's challenge to the sufficiency of the evidence of endangerment does not present a basis for federal habeas relief.

## IV.  Ineffective Assistance of Pre-trial and Standby Counsel

After making "a thorough inquiry of [petitioner] regarding his constitutional right to counsel and the dangers and disadvantages that flow from the waiver of that right," Decision & Order dated October 15, 2010, the trial court granted petitioner's request to represent himself at trial, and petitioner does not challenge that ruling here.  Although the trial court appointed

standby counsel, petitioner tried the case, beginning with jury selection.  He delivered the

opening statement and summation, cross-examined each of the state's witnesses, argued all

evidentiary points and delivered the summation.  (As will be discussed, upon petitioner's

consent, standby counsel conducted the brief direct examination of two defense witnesses.)

As the Supreme Court noted when recognizing the right of a criminal defendant to

proceed without counsel, "whatever else may or may not be open to him on appeal, a defendant

who elects to represent himself cannot thereafter complain that the quality of his own defense

amounted to a denial of 'effective assistance of counsel.'"  Faretta v. California. 422 U.S. 806,

834 n.46 (1975).  Courts have recognized, however, that "[w]here a defendant is initially

represented by counsel but subsequently requests to proceed pro se, he may allege that counsel

was ineffective at least up to the point where the defendant began to represent himself."  Jelinek

v. Costello, 247 F. Supp. 2d 212, 265 (E.D.N.Y. 2003) (Weinstein, J.) (collecting cases). This is

what petitioner has done here in claiming that two of the attorneys who represented him during

the *pre*-trial proceedings (Gary Miret and Henry Ramirez) were ineffective.

Controlling Standards

To establish that counsel was ineffective, a petitioner must show, first, that "counsel's

representation fell below an objective standard of reasonableness," Strickland v. Washington,

466 U.S. 668, 688 (1984), and second, that "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

694.  The inquiry is "whether the [challenged actions or decisions] were outside the wide range

of professionally competent assistance."  Id. at 690.

The "reasonable probability" of a different result required for Strickland prejudice is "a

probability sufficient to undermine confidence in the outcome."  Id. at 694.  See also Harrington,

562 U.S. at 104 ("It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding.") (cleaned up).  Rather, "[c]ounsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Id. (internal citation and quotation omitted).  When the alleged ineffectiveness involves a pre-trial suppression claim, to establish prejudice petitioner must show that the suppression issue was meritorious.  United States v. Jones, 2022 WL 2872515, at *6 (S.D.N.Y. July 20, 2022).

To prevail on an ineffectiveness claim that the state court has already rejected on the merits, a habeas petitioner must show that "the state court applied Strickland to the facts of his case in an objectively unreasonable manner." Woodford v. Visciotti, 537 U.S. 19, 25 (2002). This is a formidable burden: "[s]urmounting Strickland's high bar is never an easy task," Padilla v. Kentucky, 559 U.S. 356 (2010), in part because the Strickland standard is "a general one" and, therefore, the "range of reasonable applications is substantial." Harrington v. Richter, 562 U.S. 86, 105 (2011).  Further, "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult [because] [t]he standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so."  Harrington, 562 U.S. at 105 (internal quotation and citation omitted); see also Cullen v. Pinholster, 563 U.S. 170, 190 (2011) ("review of [state court]'s decision is . . . doubly deferential [because] [w]e take a highly deferential look at counsel's performance [under Strickland] through the deferential lens of § 2254(d)") (internal quotations and citations omitted) (emphasis added).  For deficiency purposes, therefore, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standards."  Id. (emphasis added).

Finally, Strickland explains that:

30

there is no reason for a court deciding an ineffective assistance claim . . . even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

Id. at 697.

Allegations involving Mr. Miret

Turning to petitioner's allegations, those involving Mr. Miret hardly require discussion. The first of petitioner's four assigned attorneys, Miret represented petitioner following his arraignment and was relieved upon petitioner's application only two weeks later, on or about July 13, 2008.[19]  Petitioner claims that Miret was ineffective for failing to investigate his alibi. This claim does not appear to have been raised in any of petitioner's state court submissions and so is unexhausted.  In any event, petitioner could not conceivably show he was prejudiced by Miret's brief period of representation.  See e.g., King v. Greiner, 2008 WL 4410109, at *47 (S.D.N.Y. Sept. 26, 2008) (no Strickland prejudice where allegedly ineffective counsel promptly replaced by new attorney before trial) (collecting cases), adopted, 2009 WL 2001439, at *11 (S.D.N.Y.  July 8, 2009).

Henry Ramirez

To the extent the sprawling and rambling allegations involving Mr. Ramirez are decipherable, they principally claim that the adverse rulings of the suppression court are the result of alleged deficiencies in Mr. Ramirez's performance.  Liberally construing these

---

[19] After petitioner expressed dissatisfaction with Mr. Miret, the court appointed John Scarpa. Approximately ten weeks later, petitioner expressed dissatisfaction with Mr. Scarpa and asked that he be relieved.  The court granted that application and appointed Mr. Ramirez.

allegations, the Court assumes petitioner intends to advance all the allegations involving Ramirez that he previously advanced in state court, either on direct appeal or in one of his 440 motions. This construction of the allegations also comports with respondent's position here, which is that this branch of petitioner's claim is exhausted.

Before addressing the allegations, the Court recounts the facts of Mr. Ramirez's representation as detailed in two decisions of the trial court. Ramirez represented petitioner for approximately 18 months until petitioner again asked for and was appointed another lawyer, Murray Singer, and only a few months into Singer's representation petitioner moved again for reassignment or in the alternative to represent himself. The first of the decisions addressing Mr. Ramirez is the trial court's order on that application. See Decision & Order dated Oct. 15, 2010. The court noted that upon Ramirez's appointment, petitioner asked him to advise the 18B panel that petitioner "still wants a white male, non-hispanic attorney to represent him." Id. at 2.

The trial court further wrote that, during the 18-months that Ramirez represented petitioner, he

> made numerous pre-trial motions including an Omnibus motion, discovery motions and a motion to introduce expert testimony on identification . . . conducted a four day pre-trial suppression hearing…made twenty-two court appearances, numerous visits to the crime scene, had experts in the field of identification, crime scene graphics, audio-visual forensics and investigations appointed to assist in the preparation of the defense, had consultations with these experts, conducted research on the relevant law, conducted twenty-five consultations with [petitioner], investigated a potential alibi defense, obtained [petitioner's] work and bank records, reviewed extensive surveillance videos of the crime scene, reviewed hospital records, had consultations with the district attorney's office and reviewed [petitioner's] weekly correspondence.

Id.

The court also credited Ramirez's report that petitioner had "complemented his work in a manner that contradicted what [petitioner] had alleged in his motion for reassignment." Id. The

court reiterated its on-the-record finding that although it was granting petitioner's request for a fourth attorney, Ramirez and "all of [petitioner's] prior counsel were competent." Id.

The second relevant trial court decision, issued at the 440 stage, rejects petitioner's allegations that Ramirez was ineffective. See Decision & Order dated Feb. 22, 2016. The court reincorporated its earlier general findings as to the quality of Ramirez's representation and also found that petitioner's contentions of ineffectiveness were—as this Court finds them to be here—"speculative, muddled, vague, and conclusory." Id. at 8. To the extent the allegations were discernibly specific, the court rejected them as either belied by the record (and to that extent embraced by the Appellate Division's rejection of the on-the-record portion of the claim), or otherwise procedurally barred.[20]

Having reviewed the record of the pre-trial proceedings in this case, the Court finds no basis to disturb the decisions of the 440 court or the Appellate Division that, combined, rejected all of petitioner's ineffectiveness allegations. Viewing those decisions through the doubly deferential lens applicable to ineffectiveness claims, the Court readily concludes that it was not unreasonable for the state courts to have determined that, to the extent the allegations are not flatly belied by the record, they fail for lack of Strickland prejudice.[21]

---

[20] For example, petitioner claimed in his 440, as he does here, that Ramirez failed to press the point that Kayla's viewing of a photo array and surveillance video tainted her viewing of the lineup, that Kayla could not have seen the assailant for the length of time she claimed, and failed to make a coherent argument for suppression of his statement to Lt. Keough. As the 440 court found, these allegations are belied by the hearing transcript.

[21] For example, petitioner alleges that Ramirez failed to seek sanctions or dismissal of the charges as a remedy for the prosecution's alleged late or incomplete discharge of its discovery obligations. The record, however, includes a trial court order denying a motion filed by Ramirez for additional discovery in which the court "is satisfied that the People have complied with the requirements of CPL § 240.20." Further, petitioner himself later filed a motion seeking

In short, as the Supreme Court cautioned in <u>Strickland</u>,

> Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

466 U.S. at 686.

The transcript of the pre-trial proceedings in this case speaks for itself.  No breakdown occurred.  The many picayune grievances voiced by petitioner about the issues litigated at those proceedings were fully aired at trial by petitioner himself during his own zealous turn at the helm.

<u>Murray Singer</u>

Petitioner also claims that standby counsel Murray Singer was ineffective during the brief pre-trial period when he was appointed as petitioner's fourth counsel of record (before the <u>Faretta</u> ruling and his conversion to standby counsel), and during his trial examination of one

---

additional discovery and sanctions for discovery non-compliance, which the court denied.  Order dated Nov. 15, 2010.

Likewise, petitioner complains that when arguing that his arrest was illegal Ramirez failed to argue, in reliance on <u>People v. Garriga</u>, 189 A.D.2d 236 (1st Dep't 1993), that the hallway of his SRO should be treated as part of his "home" for Fourth Amendment purposes.  Subsequent counsel Murray Singer, however, raised this argument in a motion for reconsideration; the court agreed to revisit the matter and adhered to its original decision.

Additionally, in seeking to blame Ramirez, rather than the facts and the law, for the ultimate admission at trial of the lineup identification, the physical evidence, petitioner's statement and the videotape evidence, petitioner fails to offer a colorable factual or legal basis not advanced by Ramirez upon which these items should have been suppressed or excluded.

defense witness.  The cognizability of these allegations is questionable.  As the Second Circuit has held, "a defendant has no Sixth Amendment right to standby counsel after he knowingly and voluntarily waives his right to an attorney," and "absent [that right], a defendant generally cannot prove standby counsel was ineffective."  United States v. Archambault, 740 F. App'x 195, 199 (2d Cir.  June 29, 2018) (cleaned up) (quoting binding precedential rulings in United States v. Morrison, 153 F.3d 34, 55 (2d Cir. 1998)  and United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997)).  See also United States v. Van Hoesen, 636 F. Supp. 2d 155 (N.D.N.Y. 2009) (defendant who elected to proceed pro se at trial has no claim of ineffective assistance against standby counsel).

The Circuit has "has left open the possibility that a defendant could make an ineffective assistance of standby counsel claim when his standby counsel held that title in name only and, in fact, acted as the defendant's lawyer throughout the proceedings.," Archambault, 740 F. App'x at 199 (cleaned up), but that is not what occurred here.  As noted, petitioner plainly captained the ship at trial, having delivered the opening statement and summation, argued evidentiary points, and cross-examined each of the state's witnesses.

To the extent the claim that Singer was ineffective is even cognizable here, it is meritless. Petitioner advanced this branch of his claim in the state court, where it was rejected.  See Dec. & Order dated Feb. 22, 2016, at 11 ("Mr. Singer also provided [petitioner] with effective representation").  Affording that rejection the double deference due ineffectiveness rulings, the Court finds no unreasonable application of Strickland.  Indeed, petitioner's complaints about Mr. Singer are frivolous.

Petitioner's complaint that Singer was ineffective for failing to produce a medical expert is belied by the record.  Before jury selection, it was petitioner who informed the court that he

35

intended to call a medical expert to testify about the technical terms used in the medical reports. At that time, the court advised petitioner that he would have to make a more specific offer of proof to establish relevance but he never made the offer.  In any event, to the extent petitioner's intention was to dispute the evidence relating to the seriousness of Eduarda's injury, he has not shown what a medical expert would have offered to dilute the strength of the state's medical evidence.  Petitioner's additional allegation, that Singer failed to provide him with Detective Kratzer's report about the Greenpoint hotel video's clock, is likewise belied by the record; as discussed, petitioner had the report when he cross-examined Detective Asam about it.[22]

In sum, petitioner's claim that pre-trial and standby counsel were ineffective does not state a basis for federal habeas relief.

## V.     Ineffective Assistance of Appellate Counsel

Touching all the bases, petitioner next claims that appellate counsel was ineffective for failing to argue that he was improperly adjudicated a second violent felony offender and for failing to argue that the prosecution's alleged late disclosure of certain discovery materials implicated his speedy trial rights.  To the extent the appellate ineffectiveness allegations

---

[22] A final frivolous allegation of ineffectiveness involves both Ramirez and Singer.  Petitioner appears to be dissatisfied with one portion of the testimony of defense witness Stuart Scherr, a graphic artist who measured the distance, by bicycle, between the crime scene and the Oh So Good Deli.  It was Ramirez who commissioned Scherr's work and Singer who questioned him at trial.  As noted, Scherr testified that "the shortest route" was .69 mile, and "the fastest route" was .793 mile.  1126.  Petitioner believes one or both of these attorneys was ineffective because Scherr performed his measurements on the assumption that the bicyclist would follow the rules of the road but, on cross-examination, acknowledged that the route could be shorter if the bicyclist did not follow those rules. Petitioner is mistaken in asserting that this nugget of testimony undermined his alibi claim that it was impossible to get from the crime to the deli in the available time and in any event this feature of Scherr's testimony does not implicate the competence of either Ramirez or Singer.

36

advanced in his coram nobis papers are fully discernible, petitioner raised only the latter allegation there.  Thus, his claim that appellate counsel failed to challenge the second violent felon adjudication is unexhausted and so cannot form the basis for a grant of habeas relief.  The other branch of his claim—advanced on coram nobis, rejected summarily by the Appellate Division, and subject to the double-deference afforded ineffectiveness adjudications under AEDPA—likewise fails to state a basis for habeas relief.  See Smith v. Robbins, 528 U.S. 259, 295-86 (2000) (Strickland governs appellate ineffectiveness claims).

In the appellate context, Strickland deference on the deficiency inquiry recognizes that attorneys "need not (and should not) raise every non-frivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."  Smith, 528 U.S. at 288; see also Jones v. Barnes, 463 U.S. 745, 751 (1983) (appellate counsel not required "to press nonfrivolous points … if counsel, as a matter of professional judgment, decides not to present [them]").  But see Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) ("omit[ing] significant and obvious issues while pursuing issues that were clearly and significantly weaker" can be ineffective appellate assistance).  To demonstrate Strickland prejudice in the appellate context, a petitioner must show "a reasonable probability that, but for [the challenged deficiency of appellate counsel], he would have prevailed on his appeal." Smith, 528 U.S. at 285.

The Appellate Division did not unreasonably apply these standards when rejecting the claim that appellate counsel was ineffective for failing to raise a speedy-trial claim relating to the timing of discovery.  Given the several trial court orders finding that the state complied with its discovery obligations (see note 21 supra), it was not unreasonable for the Appellate Division to have concluded that counsel acted competently in foregoing the claim, and that the result of petitioner's appeal would not have been different had the issue been raised.  Indeed, petitioner

himself raised a late discovery/speedy trial issue in his supplemental pro se brief and the Appellate Division summarily rejected it on the merits. *A fortiori* counsel could not be deemed ineffective for having failed to raise it.

By contrast, the brief that appellate counsel did submit evinces a high degree of competence. It presents, persuasively and with full command of the pre-trial and trial record, petitioner's two strongest appellate claims—(1) that the trial court erred in denying petitioner's request to present expert testimony about the reliability of eyewitness identifications, and (2) that petitioner's arrest without a warrant and in the absence of exigent circumstances in the hallway of his SRO hotel was unlawful (and, therefore, that the physical evidence subsequently recovered should have been suppressed).

Finally, the unexhausted branch of the claim (*i.e.*, that appellate counsel was ineffective for failing to challenge petitioner's adjudication as a second violent felon) in any event fails to state a basis for habeas relief. As discussed, in October 1995, petitioner pled guilty in New York County Supreme Court to three counts of assault in the Second Degree, a class D felony (see P.L. § 120.05), relating to the attacks on Kevin Hall, Yehoram Uziel and a third individual. He now claims that based upon Hall's and Uziel's Molineux testimony at the trial in this case, the state could not prove one of the elements required for second-degree assault—namely, either that Hall and Uziel suffered a "serious physical injury," PL §120.05[1], or that petitioner used "a deadly weapon or dangerous instrument," PL §120.05[2]. In his view, therefore, he was guilty at most of third-degree assault which, as a class A misdemeanor, would not have triggered the second violent felony adjudication. See PL §120.00. Competent appellate counsel could soundly conclude that a challenge to the 1995 convictions on the theory petitioner now advances would have been meritless under New York law. Under that law, when a defendant is arraigned as a

second violent felony offender, he has the right to challenge the constitutionality of the prior

conviction, C.P.L. § 400.15, but not factual sufficiency.  See, e.g., People v. Perkins, 89 A.D.2d

956 (2d Dep't 1982) (rejecting claim that plea allocution to the predicate felony was deficient

and distinguishing such a challenge from one "based on constitutional grounds"); People v.

Doceti, 175 A.D.2d 256 (2d Dep't 1991) (same); People v. Nance, 110 A.D.2d 857 (2d Dep't

1985) (holding that court not required to hold a hearing under CPL § 400.15 "merely because

defendant claimed the inadequacy of the factual recitation" of his guilty plea).  Petitioner did not

challenge the constitutionality of his predicate conviction at his sentencing in this case—indeed,

he had never sought to vacate the 1995 plea on which it was based.  Appellate counsel, therefore,

had no basis to challenge that conviction in the appeal in this case.

## VI.   Judicial Bias

Petitioner claims that each of the three state Supreme Court justices who handled various

aspects of his case were biased against him.  Even liberal construction of petitioner's prolix

submissions to the state court and this Court does not squarely resolve the question of whether

every theory of bias asserted here is exhausted.  But the Court need not resolve that issue in order

to deny the claim on the merits as frivolous.

The Supreme Court "identified the essential elements of a '"claim of judicial bias"' in

Bracy v. Gramley, 520 U.S. 899, 904 (1997).  The Court explained that, "most questions

concerning a judge's qualifications to hear a case are not constitutional ones, because the Due

Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform

standard."  Id.  Instead, the Court instructed, "these questions are, in most cases, answered by

common law, statute, or the professional standards of the bench and bar." Id.[26]  The Court held

that "the floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal

before a judge with no actual bias against the defendant or interest in the outcome of his

particular case." Id.

      Petitioner's claim of judicial bias is a catalog of practically every pre-trial, trial, and

sentencing ruling with which he disagrees coupled with his speculative assertion that the

adversity of the ruling must reflect judicial partiality.  But a defendant's displeasure with adverse

rulings, standing alone, is not evidence of "actual bias against" petitioner or "interest in the

outcome" of his case, Bracy, 520 U.S. at 904, and nothing in the record gives rise to an inference

of such bias or interest.  The written decision of the hearing court is supported by the record, and

at trial, the court instructed the jury, in relevant part, that "Neither by these instructions, nor by

any ruling or remark that I have made, do I mean to indicate any opinion as to the facts or as to

what your verdict should be as triers of the facts."  1232.  Indeed, the pre-trial and trial

transcripts reveal courts showing great patience with petitioner and affording him significant

latitude, particularly on the subject of choice of counsel and through the travails of his self-

representation.  He unquestionably received the constitutionally required "fair trial in a fair

tribunal." Bracy, 520 U.S. at 904.  His claim of judicial bias therefore fails to state a basis for

habeas relief.

--------

[26] Two of petitioner's allegations fall into this category.  He asserts that Justice Kron, who ruled
on some of his pre-trial motions, and Justice Zayas, who presided over his trial and imposed
sentence, lacked jurisdiction because they were not duly elected by the citizens of Queens
County.  Section 26 of Article VI of the New York State Constitution, however, authorizes
temporary assignment of New York City Criminal Court judges to the Supreme Court, and
provides that, while so assigned, they shall have "the powers, duties, and jurisdiction" of a
Supreme Court justice.

## VII.    The **Molineux** Claim

Petitioner argues that the trial court erred in admitting evidence of his prior crimes

pursuant to People v. Molineux, 168 N.Y. 264 (1901).  He specifically disputes the court's

finding that his modus operandi was sufficiently distinct to make the prior crimes probative of

identity.  He argued this position vigorously at trial and in his pro se supplemental brief to the

Appellate Division, which rejected the claim summarily on the merits.  Additionally, the

Appellate Division implicitly approved admission of the Molineux evidence in its rejection of

petitioner's expert witness claim.  See Granger, 122 A.D.3d at 941 (evidence "obviating" need

for identification expert included, inter alia, "evidence probative of petitioner's identity as the

perpetrator in this case admitted pursuant to People v. Molineux…demonstrating that [petitioner]

had committed crimes in the past by using a distinctive and unique modus operandi that was

nearly identical to the manner in which the crime was committed in this case.") (cleaned up).

To the extent petitioner's claim is that the trial court simply misapplied Molineux, he

advances a purely state-law claim, which cannot form the basis for federal habeas relief.  See,

e.g., Gopaul v. Racette, 2021 WL 5163211, at *6 (E.D.N.Y. Nov. 5, 2021) (habeas petitioner's

"Molineux argument only involves questions of state, not federal, law"); Katowski v. Greiner,

212 F. Supp. 2d 78, 86 (E.D.N.Y. 2002) (claim that trial court erroneously admitted evidence

under Molineux not cognizable on federal habeas).   Necessarily, petitioner could not show that

the Appellate Division's rejection of his challenge to the trial court's Molineux ruling is an

unreasonable application of Supreme Court law.  To the extent petitioner is arguing that the

Molineux ruling denied him due process, he would have to show first, that it was error, and

second, that the error "was so pervasive as to have denied him a fundamentally fair trial."

Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985); Gopaul, 2021 WL 5163211, at *6 (same).  The

compelling nature of the other evidence supporting petitioner's conviction forecloses any showing of fundamental trial unfairness. In sum, petitioner's challenge to the admission of evidence of his prior crimes does not state a basis for federal habeas relief.

## VIII.   Excessive Sentence

As noted, Southern District Judge McMahon determined that petitioner may not challenge the constitutionality of the 1995 conviction that served as the predicate felony for his adjudication and sentencing in Queens County as a second violent felony offender. The transferred-in petition also challenges that second felon adjudication on the ground that the 40-year combined sentence for his 1995 and 2011 convictions is cruel and unusual. It is not clear whether petitioner raised this claim in state court but in any event it is meritless. Each of the sentences imposed upon petitioner falls within the range prescribed by New York statutes.[27] That ends the § 2254 constitutional inquiry. See Desjardins v. Recette, 2021 WL 3634775, at *8 (E.D.N.Y. Aug. 17, 2021) ("It is well settled that when a sentence is in accord with the range established by state statutory law there is no constitutional issue presented for habeas review") (cleaned up) (collecting cases). Petitioner's challenge to his sentence therefore fails to state a basis for habeas relief.

---

[27] New York statutory law authorizes a maximum sentence of 25 years for a second violent felon convicted of a class B felony such as first-degree assault. See P.L. §§ 120.10, 70.04. The 25-year term imposed on petitioner in the Queens County proceeding is therefore legal. Second-degree assault, the crime of conviction in the New York County case, is a class D felony carrying a statutory sentencing range of 2 to 7 years. See P.L. §§ 120.05, 70.00. Petitioner's sentence there of 2 to 6 years on each count was therefore legal.

**CONCLUSION**

For all the reasons discussed, the application of petitioner Elie Granger for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied in its entirety.  Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.  This order also closes the consolidated civil matter 17 CV 1437.

SO ORDERED.

Dated:  Brooklyn, New York
         August 10, 2022

                                              ___s/_____
                                              RAYMOND J. DEARIE
                                              United States District Judge